**MACO BANCORP, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 94–625 C.**

United States Court of Federal Claims.

July 22, 1999.

Paul Martin Wolff, with whom were David S. Blatt and Paul C. Rauser, Williams & Connolly, Washington, D.C., for plaintiff.

David A. Levitt, with whom were Jeanne E. Davidson, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, and David W. Ogden, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

SMITH, Chief Judge.

This *Winstar*-related case is before the court on plaintiff's motion for partial summary judgment as to liability and defendant's

cross-motion for summary judgment. Plaintiff, Maco Bancorp, Inc., contends that FIRREA breached defendant's contractual obligation to recognize and honor a regulatory capital credit of $10.1065 million as part of Maco's acquisition of two failing thrifts in 1988. Defendant does not dispute that the regulatory credit was promised and that, as defendant puts it, FIRREA "withdrew" the credit. Defendant counters, however, that it still needs to be determined whether Maco committed a prior material breach of the contract or whether the regulatory capital credit was a material term of the agreement. In addition, defendant has moved for summary judgment on Count III of plaintiff's complaint, which contends that defendant breached its contractually required best efforts to cooperate with plaintiff to ensure plaintiff received the benefits of its bargain.

In addition, defendant has filed a motion for leave to file a counterclaim, contending that the government is entitled to $3 million in liquidated damages for the plaintiff's failure to make good faith efforts to acquire an additional insolvent institution. Plaintiff has opposed this motion, but the court grants the motion for leave, since the issue is interconnected to the government's defenses to the entry of liability against the government.[1]

Although defendant contended, in its opposition and cross-motion, that it needed full and complete discovery before it could respond fully to plaintiff's motion for partial summary judgment, the questions of contract formation and breach are clearly resolved in plaintiff's favor, and defendant's suppositions about possible prior material breaches by plaintiff are belied by the plain language of the contract and additional information provided by plaintiff in response to defendant's contentions. Accordingly, the court finds that plaintiff had an express contract with the government which was breached by the passage of FIRREA and its implementing regulations, and plaintiff is granted summary judgment as to Count I of its complaint.

## BACKGROUND

Almost all the critical facts about the agreement at issue are undisputed, and are set forth in plaintiff's short-form motion for summary judgment. In March 1988, Cyrus Ansary, Chairman and Chief Executive Officer of Maco Bancorp, submitted an unsolicited proposal to the Federal Savings and Loan Insurance Corporation (FSLIC) to acquire Capital Federal and Old First Federal, two federally chartered, and insolvent, mutual savings and loan associations. After extensive negotiations, it was agreed that the two institutions would be converted from mutual to stock form, merged into a new thrift, First Federal Savings Bank of Indiana ("New First Federal"), and that Maco would acquire New First Federal. In October 1988, Maco acquired New First Federal in a series of interlocking agreements by and among Maco, Capital Federal, Old First Federal, FSLIC, and the Federal Home Loan Bank Board (FHLBB). As part of the transaction, FSLIC contributed $28.75 million in assistance, and Maco invested approximately $10 million in New First Federal.

The transaction was memorialized in several documents: FHLBB Resolution No. 88–1082P, dated September 30, 1988; a September 30, 1988 letter from the FHLBB to Mr. Ansary and John William Middendorf agreeing to a variety of regulatory forbearances; a Capital Maintenance (Pre–Nuptial) Agreement, dated October 3, 1988; and an Assistance Agreement, dated October 3, 1988. Section 19(a) of the Assistance Agreement contained an integration clause.

Of particular relevance to this dispute was the capital credit provision contained in the forbearance letter, which provided:

---

1. Plaintiff has also filed a motion to strike the reply brief of defendant as covering ground far beyond its reply in support of its cross-motion for summary judgment on Count III. Plaintiff's contention is correct: defendant's purported reply brief has almost nothing to do with its own motion for summary judgment, and very much to do with its challenge to plaintiff's summary judgment motion. It is far beyond the bounds of what

is normally permissible in a reply brief. Still, the court found defendant's elucidation useful, as well as that contained in plaintiff's sur-reply brief, which plaintiff requested to be filed in the alternative if its motion to strike were not granted. Accordingly, plaintiff's alternative motion to file a reply to defendant's "reply" brief is granted. The court has considered this reply in the resolution of the instant motions.

5. It is the FSLIC's intention that a portion of the cash contribution to be made to New First Federal pursuant to an assistance agreement to be entered into between the FSLIC and New First Federal is to be a credit to New First Federal's regulatory capital; therefore, for regulatory accounting purposes, New First Federal may book approximately 35.2 percent of such contribution, or $10.1065 million of the $28.75 million given in assistance, as a direct addition to its regulatory capital . . .

. . . for purposes of reporting to the Bank Board [FHLBB], up to 35.2 percent of the cash contribution by the FSLIC to New First Federal, pursuant to the assistance agreement, shall be booked as a direct credit to New First Federal's capital account.

Also relevant are Section 7 of the Assistance Agreement, which required Maco to make good faith efforts to acquire at least one failing thrift within five years, or to make payments to the FSLIC if either those good faith efforts failed or if they did not make the specified efforts. Lastly, Section 23 of the Assistance Agreement provided that the parties should, in "good faith" and using their "best efforts," try to carry out the purposes of the agreement.

The parties do not dispute that the passage of FIRREA, the subsequent minimum capital regulations, and their explication in Thrift Bulletin 38–2 all operated to negate Maco's ability to include the $10.1065 million credit in calculating regulatory capital.

Defendant has raised four potential defenses to liability. First, defendant contends that plaintiff may have committed a prior material breach by paying excessive dividends in violation of the Capital Maintenance Agreement. Second, defendant argues that plaintiff may never have intended to acquire an additional insolvent thrift, pursuant to Section 7 of the Assistance Agreement, which may also be a prior material breach of the contract. Third, defendant contends that plaintiff may have committed a prior material breach by retaining excess cash assistance

from the FSLIC in violation of the agreement. Fourth, defendant contends that it is still unclear whether the capital credit was a material term of the contract, and that summary judgment hence cannot yet be granted until its materiality is resolved. Lastly, as part of its counterclaim, defendant contends that it is entitled to $3 million in liquidated damages because plaintiff failed to make a good faith effort to acquire an insolvent thrift pursuant to Section 7 of the Assistance Agreement.

Although in its brief and in the supporting RCFC 56(g) affidavit of defendant's counsel, defendant contends it needs discovery before these possible defenses to liability can be resolved, it turns out that they can all be resolved by a review of the plain language of the contract and the supporting and uncontroverted documentary evidence which plaintiff has provided.

### 1) Excessive dividend payments.

█ Section 4(d) of the Capital Maintenance Agreement provides that New First Federal could not declare or pay a dividend in any fiscal year "that would exceed fifty percent (50%) of the ASSOCIATION's net income, or net operating income, whichever is less, for the fiscal year as reflected on the ASSOCIATION's quarterly financial reports to the Board." It further specifies that, notwithstanding this and several other limitations "any dividends permitted under the foregoing limitations may be deferred and paid in a subsequent year."

Defendant suggests in its opening brief, and elaborates in its later briefs, that it believes Maco may have breached the dividend limitations in Fiscal Year 1990 and in at least one quarter of Fiscal Year 1992. However, as plaintiff demonstrates meticulously in its reply and sur-reply briefs, all dividend distributions in Fiscal Years 1990 and 1992 complied with the plain language of the dividend restriction contained in the Capital Maintenance Agreement,[2] all the dividends were reviewed and approved by the OTS,

---

.2. The plaintiff details its dividend distributions for FY 1990 and 1992, and their compliance with the plain language of the Capital Maintenance

Agreement, in its reply brief (pp. 4–13) and in its sur-reply brief (pp. 3–11). There is no need for the court to elaborate further on this.

and, regardless, all the dividend distributions were made after the enactment of the implementing FIRREA capital regulations, so that they cannot serve as a defense to liability anyway, unless the government's own acknowledged breach of the capital credit provision is not material, which the court will discuss below.

*2) Plaintiff's failure to make a good faith effort to acquire an insolvent thrift pursuant to Section 7 of the Capital Maintenance Agreement.*

Section 7 of the Assistance Agreement required that plaintiff make good faith efforts, defined as making five bids, including three at below liquidation cost, to acquire an insolvent institution within five years. This was to be done in lieu of profit sharing with FSLIC for those five years, and, in the event that there was failure to make such good faith efforts plaintiff was to make a liquidated payment of $3 million to FSLIC. If there was a good faith, but ultimately unsuccessful, effort to acquire another insolvent institution, plaintiff was to provide a $3 million subordinated debenture or other capital instrument to FSLIC.

Defendant contends that the preliminary evidence suggests that plaintiff never submitted a Section 7 bid, and that further discovery is necessary to determine whether plaintiff had the intent to make the requisite good faith effort to acquire an insolvent institution.

Plaintiff has provided ample evidence to show that plaintiff intended to acquire additional thrifts, including insolvent ones as part of the contract. *See* Maco Business Plan at 2 ("It is also anticipated that Maco will be required contractually to make additional supervisory acquisitions from the FSLIC"). Plaintiff further shows that it in fact made at least one such bid, for People's Federal Savings Bank, that would have been sufficient to qualify as one of the five bids Maco was to make.

Even had this evidence not been made part of the record, however, this failure

would not have been successful in defeating a judgment of liability against the government, for one important reason: defendant breached the contract long before plaintiff's five-year period to make bids had ended. Defendant responds, in effect, that the capital credit was either not material or was a separate and independent contract from the Section 7 obligation to make good faith efforts to acquire another insolvent thrift. The court will address the materiality issue below. The court finds baffling the contention that the two promises, notwithstanding that they are part of the same document are independent contracts with independent purposes. The suggestion is that because Section 7 anticipates a capital contribution by plaintiff the capital credit cannot be viewed as aiding in that endeavor. Notwithstanding the speculation of intent by defense counsel, the court declines to atomize the contract. Not only do the Ansary affidavit and the pre-contract business plan support the proposition that the regulatory capital credit was integrally related to the plan to support the assets of troubled institutions, a common sense reading of the contract as a whole supports such an understanding. Even with the financial commitments plaintiff is to provide under a Section 7 acquisition, the capital credit provides important assistance in supporting plaintiff's ability to take on an insolvent institution under Section 7.[3]

*3) Retention of FSLIC cash contribution by Maco that exceeded the institution's net worth deficit.*

There is no dispute that the Assistance Agreement provided that $28.75 million of cash be contributed to New First Federal by FSLIC, and that the cash contribution apparently exceeded New First Federal's net worth deficit by approximately $1.2 million. Defendant contends that Maco's failure to return this cash in excess of the net worth deficit constitutes a prior material breach of the contract.

---

3. Also, as plaintiff points out, even were the court to view the Section 7 obligation as a contract separate and distinct from the requirement to provide the capital credit, it would, at most,

entitle defendant to liquidated damages of $3 million for nonperformance. It would not address the question of damages plaintiff has suffered as a result of losing the capital credit.

As much as defendant hopes to find a contractual obligation for plaintiff to return the cash in excess of the net worth deficit, it does not exist. The clause is not ambiguous, and in fact the contract expressly provides for repayment or adjustments in specific circumstances; this is not one of the specified circumstances. As much as defendant now wishes that it had negotiated the return of the cash as part of the agreement, it cannot now add this term to the contract ten years later, and certainly cannot use it to defeat liability.

Two additional points bear mentioning. First, as plaintiff points out, even if this term was in the contract it would, at most, entitle the government to a setoff. The court does not see how it could excuse defendant's non-performance, particularly when defendant at no time prior to developing its defense in this case viewed the failure to return the money in excess of the net worth deficit as a breach of the contract.

Second, and more troubling to defendant's current litigating position, is that one of defendant's own documents filed in support of its theory actually makes precisely the straightforward contract interpretation plaintiff makes. The FHLBB, in a September 21, 1988 internal memorandum reviewing a request by Maco to increase the amount of financial assistance in light of what Maco contended were losses unanticipated at the time the original amount of FSLIC cash was agreed upon, stated: "[FHLBB] had negotiated an all inclusive deal of $28 million in cash assistance this past March." *See* to Def's Reply Ex. 10. While the amount of assistance was subsequently increased, although not by as much as Maco requested, this passage suggests that defendant attached the same meaning to the cash assistance provision that plaintiff, and a common sense reading, does: the amount of assistance was fixed, and not tied absolutely to the ultimate calculation of the net worth deficit.

*4) Materiality of the capital credit provision*

Defendant contends that the circumstantial evidence suggests that the parties did not view the capital credit provision as material, and it is necessary for discovery to adduce evidence as to its materiality.

Plaintiff demonstrates, through the affidavit of Mr. Ansary, the clear and unambiguous intentions expressed in the pre-contract business plan, the history of negotiations, and, lest we forget, *the express language of the contract,* that the capital credit was a bargained-for term of this contract.

In addition, defendant repeats the tired argument that the capital credit is not material because the institution would still be solvent once the credit was removed. This once again attempts to turn a fact made in support of finding contractual intent (that it would otherwise be madness to enter into the agreement absent the existence of a contract) into a contractual hurdle. It is not the law, however. *See California Federal Bank v. United States,* 39 Fed.Cl. 753, 767–68 (1997).

*5) Defendant's Motion for Summary Judgment as to Count III of plaintiff's complaint.*

Defendant has moved for summary judgment as to Count III of plaintiff's complaint. Plaintiff contends in Count III that defendant breached its promise, contained in Section 23 of the Assistance Agreement, to work in "good faith" to "carry out the purposes of this Agreement." Plaintiff contends that defendant breached its duty to cooperate in the acquisition of an insolvent institution by Maco pursuant to Section 7, which plaintiff contends was one of the benefits and risks bargained for as part of the contract.

Plaintiff has adduced evidence, in the form of Mr. Ansary's affidavit, which suggests, even prior to the passage of FIRREA, that Maco was informed that it could not use the capital credit to support another acquisition, and that the government was not selling thrifts pending the passage of the FIRREA legislation. If it were true that defendant impeded plaintiff's ability to purchase another insolvent thrift or thrifts, even prior to the breach occasioned by FIRREA's passage, then plaintiff may have a claim for breach of the duty to cooperate in good faith, even prior to the passage of FIRREA. However,

defendant is entitled to discover evidence that challenges the statements made in Mr. Ansary's affidavit regarding this issue. Accordingly, both plaintiff's and defendant's motions for summary judgment regarding Count III are denied.[4]

The court notes that, ultimately, the question of the import of plaintiff's failure to purchase an insolvent institution goes to damages issues. Plaintiff maintains that the ability to purchase an insolvent institution under Section 7 of the Assistance Agreement was a benefit to Maco that was abrogated by the breach of the capital credit and the duty to cooperate. It certainly was, in part, a burden, since it clearly obligated Maco to make a capital commitment and was in the contract in lieu of New First Federal profit sharing with FSLIC. It may well have been intended to benefit Maco also, but that is a question that the damages phase of the litigation is better equipped to answer.

## CONCLUSION

The court finds that plaintiff had an express contract to use the capital credit set forth in the forbearance letter to meet regulatory capital requirements, and that the passage of FIRREA and its implementing regulations breached that express contract. Accordingly, plaintiff is granted summary judgment as to liability on Count I. The court denies plaintiff's motion for summary judgment as to Count II, concerning the breach of an implied-in-fact contract, in light of the court's holding that there existed an express contract. The court denies both cross-motions as to Count III, and reserves consideration of the issue, at least as it relates to contentions of contractual breaches prior to the passage of FIRREA, to the next phase of the litigation.

Accordingly, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 8, 1996) and the Priority Cases Pretrial Scheduling Order (April 2, 1997), this case is assigned to Senior Judge Robert J. Yock as Trial Judge for all further proceedings, ex-

cept for motions for clarification of this opinion.

**IT IS SO ORDERED.**

---

4. The court also notes that Count III, at least as it regards the breach of the capital credit provision by the passage of FIRREA and its implementing regulations, is redundant in light of the court's grant of summary judgment on Count I.